IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ROY IRWIN WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:14-CV-276-WKW |
| | ) | [WO] |
| WILLIAM PHARES, individually, | ) | |
| and CITY OF DOTHAN, | ) | |
| ALABAMA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This 42 U.S.C. § 1983 and state-law action arises from an incident in which a City of Dothan police dog bit Plaintiff without a command from his handler, Corporal William Phares. Before the court are Plaintiff's and Defendants' cross motions for summary judgment, responses, and replies. (Docs. # 30, 31, 32, 33, 36, 37, 39, 40.) The parties have fully briefed the motions and have submitted evidence in support of their opposing positions. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that on the federal-law claims, Defendants' motion is due to be granted and Plaintiff's motion is due to be denied. Because the court declines supplemental-jurisdiction over the state-law claims, the cross motions are due to be denied as moot on the state-law claims.

## I.  JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry

its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.   A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND[1]

**A.**     **The Facts Surrounding Mr. Wilson's Dog-Bite Injury on April 14, 2012**

In April 2012, Mr. Wilson worked as a bus driver for Bay Limousine Company, which operates out of a facility in Dothan, Alabama.  The facility includes both warehouse and office space.

Because Mr. Wilson commuted approximately ninety miles from his residence in Panama City Beach, Florida, to Dothan, his employer provided him accommodations for sleeping and showering between assigned driving routes. These accommodations were located in a room behind the owner's office and had two locking doors.  During the evening of April 13, 2012, Mr. Wilson settled in for a night's sleep in the employer-provided room at the Bay Limousine facility, and

---

[1] While the parties rely on substantially the same arguments and facts in advocating both for and against summary judgment, there are some conflicting facts.  The court has examined each party's motion for summary judgment individually, construing the facts in favor of the non-movant in each of the motions.  That analysis reveals that Defendants are entitled to summary judgment.  Accordingly, the facts in this opinion are construed in the light most favorable to Mr. Wilson.

he locked the room's two doors.   Unbeknownst to Mr. Wilson, another driver, Robert Floyd, was en route to Bay Limousine to return a company car, and, upon his arrival at 11:40 p.m., Mr. Floyd observed an unfamiliar vehicle drive around to the back of the facility.   To avoid a confrontation with the individual in that vehicle, Mr. Floyd left the area and called the Dothan Police Department.   Officer Jack Hunt responded to the call and met Mr. Floyd at an intersection near Bay Limousine.   Corporal Phares and his canine partner, Kazan, and Officer Chris Miller responded as Officer Hunt's backup.

The officers and Mr. Floyd returned to Bay Limousine, which is located in a known high-crime area, but the suspicious vehicle was no longer there.   Mr. Floyd informed the officers that he "could not tell if someone had entered the building because the door is usually left unlocked." (Floyd's Aff., at 2.)   He also said that, to his knowledge, no employees were inside the building.   Mr. Floyd then requested the officers to search the building for intruders.

Corporal Phares retrieved his canine partner, Kazan, and Officer Miller joined them at the building's entrance.   Before entering, Corporal Phares gave three loud commands, "Dothan Police Department, K-9 is entering the building[. S]peak now or you could be bit[ten]." (Phares's Aff., at 2.)   According to Corporal Phares and Officer Miller, the commands "were loud enough that anyone in the building could have heard [the] warnings." (Phares's Aff., at 2;

4

Miller's Aff., at 2.)  After the oral commands elicited no response, the two police officers and the canine entered the dark building and began a search of the warehouse area where the company vehicles are stored.  After a few minutes, Corporal Phares unleashed Kazan to complete the search.  When the officers and Kazan reached the "far end of the building" in the warehouse area, Officer Hunt entered the main entrance's doorway and yelled to ask if they needed assistance. Corporal Phares yelled back using a curse word, commanding Officer Hunt to get out of the building so as to not interfere with Kazan's search for human scent.

Kazan did not detect a person in the warehouse area of the building.  Kazan and his handler then moved toward the office space where Kazan alerted to human scent.  Tracking the scent down a narrow hallway, Kazan stopped and sat down in front of a closed door, which he is trained to do when he detects a person.

By that time, Mr. Wilson had been awakened by Corporal Phares's earlier cursing and the sound of a pipe or similar object hitting the floor.  Mr. Wilson could see shadows moving under the door, and then all of a sudden, the locked door to his room "was kicked in or otherwise broken into in a loud and violent fashion."[2]  (Pl.'s Aff., at 1.)  Corporal Phares entered the room, and three feet in front of him was Mr. Wilson, a 6' 2" tall, 245-pound man.  Corporal Phares did not

---

[2] Mr. Wilson and Defendants dispute whether the door was locked.  For summary judgment purposes, Mr. Wilson's attestation that the door was locked is presumed as true.

issue a command for Kazan to apprehend Mr. Wilson; however, according to Corporal Phares, Kazan perceived a threat to Corporal Phares's safety based on Mr. Wilson's sudden and close presence and, pursuant to his training, immediately lunged toward Mr. Wilson to protect his handler from that threat.  Kazan "bit [Mr. Wilson] on the [right] leg," tearing two holes in his pants leg, and "shook [him] until he was brought to the ground."  (Pl.'s Aff., at 2.)  After Mr. Wilson was on the floor, Corporal Phares tried physically and with oral commands to get Kazan to retreat, but the dog continued to bite and hold onto Mr. Wilson.  Corporal Phares then pulled Kazan's collar off in an attempt to get Kazan to stop holding and biting Mr. Wilson's leg.  Ultimately, Corporal Phares succeeded, and Kazan released his hold on Mr. Wilson.  Mr. Wilson does not provide a time frame for the attack, but Corporal Phares says that within four to eight seconds of the dog's "engaging Mr. Wilson," he grabbed Kazan by the neck and pulled him off.  (Phares's Aff., at 3.)

Mr. Wilson explained to the officers that he "live[d] and work[ed]" at the business.  (Offense Report, at 2.)  At that point, Corporal Phares took Kazan to the patrol car, but then returned to the room where he had found Mr. Wilson.  Upon further questioning, Mr. Wilson said that he did not hear Corporal Phares's initial warning.  He said, however, that he did hear the loud utterance of a curse word but that he thought that an irate employee was yelling at the camera system.  It is

undisputed that Mr. Wilson was not arrested or charged with a crime or forcefully removed from the premises of Bayside Limousine.

That evening, while the officers still were at the scene, Corporal Phares requested paramedics to respond to examine Mr. Wilson's bite wound, and Mr. Wilson received treatment at a local hospital. The hospital physician diagnosed the wound as a "superficial laceration," which was cleaned with saline and polysporin ointment. Mr. Wilson also received a tetanus shot.

## B.   **Dothan Police Department's Canine Policy**

Pursuant to a policy that meets the standards established by the Commission on Accreditation of Law Enforcement Agencies, the Dothan Police Department uses canine units as part of its repertoire of law enforcement tools. The canine policy in effect in April 2012 authorized canine force when necessary to make an arrest of an offender, when probable cause existed for a felony or a misdemeanor involving a crime of violence, or to protect the canine officer or other law enforcement officer from injury or death. (Policy, at 4 (Doc. # 31, at 7).) The policy also set out a protocol for a building search. Under that policy, both "on" and "off lead" searches by the canine are permissible. Before entering the building, though, the canine officer must make every effort to verify that innocent or authorized individuals are not in the building, and the canine officer must announce that his or her trained police canine is about to search the building.

During the search, only the canine, his or her handler, and another officer (if requested) can enter the building.

## C.   <u>This Lawsuit</u>

Believing that the Dothan Police Department had violated his legal rights, Mr. Wilson, proceeding *pro se*, filed a verified complaint on April 14, 2014.[3] Shortly into the litigation, Mr. Wilson obtained counsel, who filed the operative Amended Complaint.  The Amended Complaint contains eight counts – six under federal law and two under state law – against the City of Dothan and Corporal Phares in his individual capacity.  The Amended Complaint predicates subject-matter jurisdiction under §§ 1331 and 1343 as to the federal-law claims and under § 1367 as to the state-law claims.

Counts One, Two, and Three of the Amended Complaint are Fourth and Fourteenth Amendment claims brought pursuant to § 1983 against Corporal Phares for false arrest, excessive force, and warrantless entry/search.  Counts IV, VI, and VII allege § 1983 claims against the City of Dothan for its alleged unconstitutional

---

[3] As to the timeliness of this § 1983 suit, there is a factual dispute as to whether the forced, warrantless entry into the locked room where Mr. Wilson was sleeping occurred in the early morning hours of April 13, 2012, or April 14, 2012.  Defendants' affidavits pinpoint the date as April 13, 2012, while Plaintiff's affidavit indicates that it was April 14, 2012.  The date is important, according to the parties, on the issue of whether the statute of limitations on the § 1983 claims has run.  The court accepts for purposes of summary judgment, as it must, that the date was April 14, 2012, which forecloses for present purposes Defendants' statute of limitations defense.

customs, policies, and deficient training that allegedly caused the violations of Mr. Wilson's constitutional rights.[4]   Counts VIII and IX allege state-law claims for false arrest, negligence, and wantonness against Corporal Phares.  After a period of discovery, the parties filed cross motions for summary judgment, and the motions are ready for disposition.

## IV.  DISCUSSION

The following discussion addresses:  (1) the § 1983 claims against Corporal Phares under the qualified immunity standard; (2) the § 1983 claims against the City of Dothan; and (3) the state-law claims against Corporal Phares.

**A.**   **The § 1983 Claims Against Corporal Phares in His Individual Capacity**

**1.**   ***Qualified Immunity Standard***

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is

> a muscular doctrine that impacts on the reality of the workaday world as long as judges remember that the central idea is this pragmatic one: officials can act without fear of harassing litigation only when they

---

[4] The Amended Complaint does not contain a Count V.

> can reasonably anticipate – *before* they act or do not act – if their conduct will give rise to damage liability for them.

*Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013) (citation and internal quotation marks omitted).  Because qualified immunity is meant to relieve officials of the burden of trial or protracted litigation, qualified immunity questions should be settled "at the earliest possible stage of litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  The defendant-official who invokes qualified immunity bears the burden of establishing that he was acting within his discretionary authority. *Maddox*, 727 F.3d at 1120.  If the defendant-official satisfies that burden, the burden shifts to the plaintiff to demonstrate that (1) the defendant violated a constitutional right and (2) the right was clearly established when the defendant acted.  *Id.*  These two elements may be analyzed "in whatever order is deemed most appropriate for the case."  *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009)).

It is undisputed that Corporal Phares was acting within his discretionary authority as a police officer for the City of Dothan when he and his canine partner searched the Bay Limousine facility.  The focus of the qualified immunity inquiry, therefore, is on Mr. Wilson's twofold burden.

10

2.    *Excessive Force*

a.    **Whether Corporal Phares Violated Mr. Wilson's Fourth Amendment Rights Against Excessive Force in a Seizure**

The Amended Complaint alleges that Corporal Phares seized Mr. Wilson with excessive force "by and through the use of his canine" in violation of Mr. Wilson's Fourth Amendment rights.  (Am. Compl., at ¶ 12 (Doc. # 14); *see also* Pl.'s Summ. J. Br., at 10 (Doc. # 33).)  Defendants emphasize that Corporal Phares did not command his canine partner, Kazan, to apprehend Mr. Wilson, but that Kazan acted on his own in accordance with his training to protect his handler from a perceived threat.  Mr. Wilson argues, on the other hand, that Corporal Phares must be held responsible for the seizure because he made the decision not to "leash his canine" or "attempt to call Mr. Wilson out" of the locked room.  (Pl.'s Summ. J. Resp., at 17 (Doc. # 37).)  The parties' arguments raise the issue of whether there was a Fourth Amendment seizure, and it turns out that this issue is dispositive.

The Supreme Court has held that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The Fourth Amendment requires a "government seizure."  *Reyes v. Maschmeier*, 446 F.3d 1199, 1203 (11th Cir. 2006) (citing *Evans v. Hightower*, 117 F.3d 1318, 1320

11

(11th Cir. 1997)).  Hence, "[t]he first step in reviewing an excessive force claim is to determine whether the plaintiff was subjected to the 'intentional acquisition of physical control' by a government actor – that is, whether there was a 'seizure' within the meaning of the Fourth Amendment."  *Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)).

A Fourth Amendment seizure does not occur in all circumstances when "there is a governmentally caused termination of an individual's freedom of movement . . . , but only when there is a governmental termination of freedom of movement through means intentionally applied."  *Brower*, 489 U.S. at 596–97; *see also id.* at 596 (providing that willfulness is "implicit in the word 'seizure,' which can hardly be applied to an unknowing act").  *Brower* provided the following hypothetical to illustrate when a seizure does not result from means intentionally applied, notwithstanding that "there is a governmentally caused . . . termination of an individual's freedom of movement":  "[I]f a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment."  *Id.* at 596.

Although not addressed by the parties, there are decisions emanating from other circuits – both at the appellate and trial level – that present factual scenarios somewhat analogous to the present case.  In *Andrade v. Burlingame*, 847 F. Supp.

760 (N.D. Cal. 1994), the court addressed whether a Fourth Amendment seizure had occurred during a traffic stop by a canine unit. The initiating officer exited his patrol car and left the door cracked with the canine unsecured in the backseat. His police canine slipped out of the patrol vehicle through the partially open front door and into the suspects' car and bit two of the backseat passengers without the officer's knowledge or command. The court found that, because the officer "did not intend to use his police dog to subdue the plaintiffs," the officer did not engage in intentional conduct as required to establish a Fourth Amendment seizure: "The key question [was] whether *Officer Harman* intended to seize plaintiffs by means of the dog[,] and the answer [was] indisputably 'no.'" *Id.* at 764; *see also id.* at 764 n.6 ("The fact that a particular action may be a common law tort does not mean that it is necessarily actionable as a constitutional violation.").

Similarly, in *Neal v. Melton*, 453 F. App'x 572 (6th Cir. 2011), during a traffic stop, an officer deployed his police dog to sniff around the suspects' vehicle for drugs and then put the dog back in the patrol vehicle. Unknown to the officer, the unsecured dog got out of the police car, jumped into the back seat of the suspects' vehicle where a child was restrained in a child safety seat, and scratched the child. Holding that there was not an unlawful seizure required to establish a § 1983 claim against the officer for excessive force when his canine injured the child, the Sixth Circuit recognized that "[n]egligence may be evident from [the

13

officer's] failure to adequately secure" the police dog, but held that "this [was] not the type of intentional or knowing contact required for a § 1983 claim." *Id.* at 577. The Sixth Circuit in *Neal* relied upon *Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2004).

In *Dunigan*, where a police canine entered a home to search for a fugitive, the Sixth Circuit held that the third-party plaintiff was not seized within the meaning of the Fourth Amendment where the officer did not instruct his leashed police dog to bite her. Rather, the police dog reacted in accordance with its training to a perceived threat to the dog handler's safety when the plaintiff stumbled into the dog's "defensive perimeter," and "a reasonable jury could only conclude [the dog's] actions were a spontaneous response to [the p]laintiff's 'threatening' movement." *Id.* at 492–93; *see also Hansen v. City of St. Paul*, No. 06-1286, 2007 WL 4224052, at *3 (D. Minn. Nov. 27, 2007) (finding no Fourth Amendment seizure when, in pursuit of a suspect, the officer's police canine bit an innocent bystander because the "dispositive inquiry [was] not whether [the officer] intended to release [the canine], the means of the seizure, but whether [the officer] intended to seize [the plaintiff], the eventual object of the seizure").

Here, as in the foregoing cases, Mr. Wilson fails to present evidence from which a reasonable jury could infer that Corporal Phares intended to seize Mr. Wilson through Kazan.   First, there is no evidence that Corporal Phares

commanded Kazan to bite Mr. Wilson.  Rather, the evidence reveals that, when the door opened, revealing Mr. Wilson three feet away on the other side, Kazan sensed an "immediate threat" to his handler and bit Mr. Wilson without a command. (Phares's Aff., at 3.)  As to these salient facts, Mr. Wilson's testimony aligns with Corporal Phares.  Namely, Mr. Wilson attests that, once the door opened and Corporal Phares and Kazan entered, "[t]he canine ran directly to [him] and attacked [him]."  (Pl.'s Aff., at 2.)  In short, Mr. Wilson provides no evidence that Kazan's bite was commanded by Corporal Phares.

Second, Corporal Phares's reaction to Kazan's biting of Mr. Wilson amplifies that Corporal Phares lacked the requisite willfulness to effectuate a seizure of Mr. Wilson.  Corporal Phares tried to get Kazan to release Mr. Wilson, both with oral commands and physical force, but, as Mr. Wilson acknowledges, Kazan "did not respond to [Corporal] Phares's apparent instruction to cease." (Pl.'s Aff., at 2.)  Mr. Wilson also confirms that Corporal Phares persisted in his efforts to release Mr. Wilson from Kazan's bite and hold until finally those efforts succeeded.  Corporal Phares's prompt response to his canine's behavior points to the conclusion that Kazan acted spontaneously to protect his handler.

Third, as stated, Mr. Wilson focuses on the facts that Corporal Phares intentionally permitted Kazan to conduct the premises search off leash (in conformity with police policy), did not put the canine back on the leash when it

detected a human scent on the other side of the door, and did not re-announce his presence prior to his forced entry into the locked room.[5]   The fact that Kazan was not leashed when he bit Mr. Wilson admittedly is a fact not present in *Dunigan* where the canine was leashed when it bit the plaintiff who had stumbled into the dog's "defensive perimeter," 390 F.3d at 492, but this distinguishing fact is not dispositive.   Similar to *Hansen*, where the police officer purposefully released his police dog to pursue a fleeing suspect and the dog bit an innocent bystander, the crucial issue for purposes of analyzing whether there was a Fourth Amendment seizure is not whether Corporal Phares "intended to release" Kazan (or intended to enter the room where Mr. Wilson was), but whether Corporal Phares "intended to seize" Mr. Wilson.   2007 WL 4224052, at *3.   Evidence is lacking that Corporal Phares intended to seize Mr. Wilson through Kazan, which is the underpinning of Mr. Wilson's Fourth Amendment excessive force claim.   Rather, even when viewed in the light most favorable to Mr. Wilson, the evidence gives rise to the reasonable inference that Mr. Wilson's injury was the unintended consequence of governmental action, namely, the unassisted, instinctive, and spontaneous reaction of Corporal Phares's canine partner who sensed danger to his handler.

---

[5] Mr. Wilson brings a separate Fourth Amendment claim challenging the warrantless entry into the locked room of the commercial premises, which is addressed in Part IV.A.4.

Even if the facts present an arguable demonstration of negligence on Corporal Phares's part for failing to leash Kazan or re-announce police presence prior to entering the locked room, negligence is not the operative standard for purposes of the Fourth Amendment and, without evidence of any intentional governmental conduct, cannot support a § 1983 Fourth Amendment claim. *See Dodd v. City of Norwich*, 827 F.2d 1, 7–8 (2d Cir. 1987) (The Fourth Amendment "only protects . . . against 'unreasonable' seizures, not seizures conducted in a 'negligent' manner."); *cf. Daniels v. Williams*, 474 U.S. 327, 333 (1986) (concluding in a Fourteenth Amendment case that "injuries inflicted by governmental negligence are not addressed by the United States Constitution").

Based upon the facts and case law, there is insufficient evidence to raise a genuine dispute of material fact that Corporal Phares seized Mr. Wilson "through means intentionally applied." *Brower*, 489 U.S. at 597. Absent a seizure, there can be no Fourth Amendment violation, and Mr. Wilson's excessive force claim cannot survive summary judgment.

### b.    Whether Corporal Phares Violated Clearly Established Fourth Amendment Law

Where there is no constitutional violation, the court "need go no further in [the] qualified immunity analysis." *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002). Nonetheless, even assuming *arguendo* that there was a Fourth Amendment

17

seizure, the clearly established prong of the qualified immunity analysis presents an alternative basis for granting summary judgment in Corporal Phares's favor.

Mr. Wilson does not cite any binding authority establishing that, under the circumstances Corporal Phares faced, he could be held liable under the Fourth Amendment for excessive force based upon his police dog's spontaneous bite of an individual where he did not command the attack.  The court's independent research also came up empty.  Because the contours of the law are not clearly established so that a reasonable officer in Corporal Phares's position would have known that his actions violated Fourth Amendment seizure law, Corporal Phares is entitled to qualified immunity.

### 3.   *False Arrest*

The Amended Complaint also alleges a "false arrest" claim that Corporal Phares "arrest[ed] . . . [Mr. Wilson] by and through the use of his canine, Kazan" without probable cause to believe that Mr. Wilson had committed any crime.  (Am. Compl., at ¶ 11.)  The Amended Complaint rests on the Fourteenth Amendment's protection against deprivations of liberty without due process of law, and, thus, presents a commingling of terminology of the Fourth and Fourteenth Amendments. But, as Mr. Wilson recognizes in his summary judgment briefing, the constitutional standard upon which he intended to rely for his false arrest arises under the Fourth Amendment, not the Fourteenth Amendment.  (*See* Pl.'s Summ. J.

Br., at 10 (Doc. # 33) (observing that, as to his false arrest claim, "an unlawful seizure occurred in violation of the Fourth Amendment")); *Walker v. Briley*, 140 F. Supp. 2d 1249, 1260 n.8 (N.D. Ala. 2001) (finding that a § 1983 claim for false arrest is "firmly anchored to the Fourth Amendment's guarantee against unreasonable searches and seizures").  The Fourth Amendment then, rather than the Fourteenth Amendment, guides the analysis, and both Mr. Wilson and Defendants have analyzed this case solely under the Fourth Amendment.  The court, therefore, does the same.[6]

A false arrest claim, like an excessive force claim, requires a seizure. "'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment."  *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012).  Defining the seizure for purposes of his false arrest claim, Mr. Wilson contends that Corporal Phares "seized [his] person by and through the use of his canine partner, Kazan."  (Pl.'s Summ. J. Br., at 10 (Doc. # 33); *see also* Pl.'s Summ. J. Resp., at 9 (Doc. # 37) ("To be clear, it is the detainment by and through

---

[6] With respect to the Fourteenth Amendment's substantive due process component, "the Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the States," and "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  *County of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1988).  As mentioned in the preceding section, the best case scenario for Mr. Wilson is that the evidence amounts to negligence.  Hence, had Mr. Wilson pressed it, there is no evidence in the record that would have sustained a Fourteenth Amendment substantive due process claim.

the use of the canine's attack on [Mr. Wilson] about which [he] complains in this suit; not necessarily the investigatory questioning that may have followed it.").)

For purposes of this case, the seizure analysis is the same for the Fourth Amendment false arrest and excessive force claims.   As the court already has found, there is no evidence from which a reasonable jury could find a Fourth Amendment seizure.   Accordingly, there is no Fourth Amendment violation, and Corporal Phares is entitled to summary judgment and qualified immunity on the Fourth Amendment false arrest claim for the same reasons discussed in Part IV.A.2.

### 4.   *Warrantless Entry into the Locked Room on the Employer's Premises*

Mr. Wilson also brings a claim alleging that the warrantless entry into his sleeping quarters at his employer's place of business – in and of itself and apart from the police canine bite – violated his Fourth Amendment right to be free of an unreasonable search.  (Am. Compl., at ¶ 14.)  As to this claim, Defendants advance three principal summary judgment arguments.   First, they contend that Mr. Floyd, as an employee of Bay Limousine, had actual or apparent authority over his employer's premises such that his consent to search the building for possible intruders supplied valid consent for a warrantless search of the *entire* building. Second, Defendants argue that Mr. Wilson did not have a legitimate expectation of

privacy in the area of his employer's facility where he slept because other employees had access to that room.  Third, Defendants contend that, even if Mr. Floyd's consent was not valid and Mr. Wilson had a legitimate expectation of privacy in the area where he was sleeping so as to require his consent for entry, an objectively reasonable officer could have believed that Mr. Floyd's consent to search the building supplied valid consent for a warrantless search of the entire building and that, therefore, qualified immunity is appropriate.

Mr. Wilson argues that Defendants are wrong on all points.  He contends that he had manifested a subjective expectation of privacy in the sleeping quarters his employer provided him "by closing the door and/or . . . sleeping there" and that he "had a recognized, reasonable expectation of privacy in th[is] office space which was not open to the public."  (Pl.'s Summ. J. Br., at 6.)  Comparing his situation to that of a hotel guest, he contends that consent to search his locked sleeping quarters could not rest upon the consent of Mr. Floyd.  Mr. Wilson also argues that Mr. Floyd had neither actual nor apparent authority to consent to a search of his employer's business – "be it the search of the warehouse, the office, or [Mr. Wilson's] sleeping quarters."  (Pl.'s Summ. J. Resp., at 6 (Doc. # 37).)  He argues that it was not reasonable for Corporal Phares to believe that Mr. Floyd had actual or apparent authority over Bay Limousine's facility when Mr. Floyd made no representation of his authority beyond that he was an employee, when the

business appeared to be closed, and when Mr. Floyd was not physically present inside the facility when he gave consent.  Mr. Wilson contends that there is no evidence that Mr. Floyd "had a right of common use of the facility after hours" or "any authority over the facility – arguable or not."  (Pl.'s Summ. J. Reply, at 3 (Doc. # 39).)   In sum, Mr. Wilson contends that he has shown a Fourth Amendment violation and that Corporal Phares is not entitled to qualified immunity.

### a.   Initial Observation

As an initial matter, it is important to distinguish between the warrantless entry at its inception (*i.e.*, Corporal Phares's initial warrantless entry into Bay Limousine's warehouse area) and in its scope (*i.e.*, the expansion of the warrantless search from the facility's warehouse space to the warrantless entry into the locked room in the office space where Mr. Wilson was sleeping).  The Amended Complaint's claim restricts itself to the Fourth Amendment legality of Corporal Phares's warrantless entry into the locked room where Mr. Wilson was sleeping and his alleged "legitimate expectation of privacy in those quarters."   (Am. Compl., at ¶ 14.)  Additionally, Mr. Wilson's summary judgment briefing includes no argument, evidence, or authority that his purported expectation of privacy in the on-premises sleeping quarters at Bay Limousine's facility extended to the separate warehouse space such that he may invoke the Fourth Amendment's protections

with respect to the warrantless search at its inception.  That is, Mr. Wilson neither alleges nor demonstrates that he has standing to challenge Corporal Phares's initial entry and search of the Bay Limousine warehouse area.  *See Lenz v. Winburn*, 51 F.3d 1540, 1549 n.10 (11th Cir. 1995) ("Absent a reasonable expectation of privacy, a possessory interest does not support standing to object to a *search*.").  Nonetheless, the validity of Mr. Floyd's consent for the initial warrantless entry into Bay Limousine's facility is not completely irrelevant to the analysis because Defendants argue that Mr. Floyd's consent validated the search of the *entire* premises, which necessarily includes the locked room.  The discussion proceeds against this backdrop.

### b.    General Principles of Fourth Amendment Law

The parties' arguments focus on whether Mr. Wilson had a legitimate expectation of privacy in the locked room on his employer's premises and whether Mr. Floyd, also a Bay Limousine employee, could give valid consent for the search of that room.  Some discussion of these general principles of Fourth Amendment law is helpful at the outset.

The Fourth Amendment protects persons and their "houses" from "unreasonable searches and seizures."  U.S. Const. amend. IV.  The individual invoking the Fourth Amendment's protections against unreasonable searches and seizures must demonstrate "an objectively reasonable expectation of privacy in the

place searched or the item seized" to have standing to challenge the search or seizure. *Rehberg*, 611 F.3d at 842; *see also Smith v. Maryland*, 442 U.S. 735, 740 (1979) (The Supreme Court "uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." (citation and internal quotation marks omitted)). "To establish a reasonable expectation of privacy, the person must show (1) that he manifested 'a subjective expectation of privacy' in the item searched or seized, and (2) a willingness by society 'to recognize that expectation as legitimate.'" *Id.*; *see also Gennusa v. Canova*, 748 F.3d 1103, 1110 (11th Cir. 2014) ("[A] Fourth Amendment search occurs 'when the government violates a subjective expectation of privacy that society recognizes as reasonable.'").

Additionally, under the Fourth Amendment, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *United States v. Watkins*, 760 F.3d 1271, 1278 (11th Cir. 2014). One exception "is that a warrantless search is permissible if it is preceded by a valid consent." *Id.* The Supreme Court has held that anyone who "possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected" may consent to the search of another's property. *United States v. Matlock*, 415 U.S. 164, 171 (1975). Common authority is "joint access or

24

control for most purposes," *id.* at 171 n.7, and can be either actual or apparent. *See Watkins*, 760 F.3d at 1278 ("Valid consent may be granted by a person with actual or apparent authority to give permission to search."). Hence, even if the party who gives consent does not have actual authority to provide consent, if he or she had apparent authority, the consent is constitutionally valid. Apparent authority exists where a law enforcement officer, "at the time of entry, reasonably believed [that the third party] possessed authority over the premises." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990)). "The determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* The court now turns to the analysis.

        **c.**    **Analysis**

There is a legal butting of heads as to whether Mr. Wilson had a legitimate expectation of privacy in his employer-provided sleeping quarters and whether Corporal Phares received valid consent – either actual or apparent – from a Bay Limousine employee (*i.e.*, Mr. Floyd) to enter the locked sleeping quarters without a warrant. In this particular case, it is fitting to bypass the first step of the qualified immunity analysis and address only the clearly established prong, rather than to decide the admittedly more difficult question of whether there was a Fourth

Amendment violation.  *See Rehberg*, 611 F.3d at 839; *see also Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) ("[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all.").   Hence, the court proceeds directly to whether the clearly established prong of the qualified immunity analysis shields Corporal Phares from personal liability and does not reach the issue of whether the evidence, viewed in the light most favorable to Mr. Wilson, establishes that Corporal Phares's warrantless entry into the locked room violated the Fourth Amendment.

To strip Corporal Phares of his qualified immunity defense, Mr. Wilson must show that it would have been "*clear* to a reasonable officer" that his warrantless entry into the locked room at Bay Limousine's facility was unlawful in light of the facts known to him and the clearly established law in April 2012. *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (citation and internal quotation marks omitted).   "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. at 223.

One method – and the usual method – for demonstrating clearly established law examines "the relevant case law at the time of the violation; the right is clearly

established if 'a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'" *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011) (alterations in original) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1333 (11th Cir. 2008)). "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). Also, only binding precedent, *i.e.*, "cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose," can clearly establish the right in question. *Id.*

To begin, Mr. Wilson cites no case from the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court published prior to April 2012 that provides the requisite concrete factual clarity establishing that he had a reasonable expectation of privacy in the locked room on his employer's premises. Mr. Wilson relies upon *Stoner v. California*, 376 U.S. 483, 489 (1964), but it does not fit the clearly established bill for purposes of this case.

In *Stoner*, while a hotel guest (*i.e.*, the criminal defendant) was out of his room, a hotel clerk gave police consent to conduct a warrantless search of the hotel room for evidence linking the guest to a robbery. The Supreme Court held that, "[n]o less than a tenant of a house, . . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures" and that the

27

warrantless search conducted without the consent of the room's occupant violated the Fourth Amendment. *Id.* at 490. Hence, in *Stoner*, the hotel guest had a Fourth Amendment reasonable expectation of privacy in his hotel room that required his consent for entry, thus establishing the "general rule . . . that a hotel employee does not have authority to consent to a warrantless search of a room rented to a guest." *Mercer*, 541 F.3d at 1074. But, factually, *Stoner* is inapposite for purposes of clearly establishing the law as to the Fourth Amendment issue of privacy in this case.

The warrantless search here took place at the facility of a commercial business that provided transportation services, not as in *Stoner*, at a hotel establishment that provided lodging for paying guests. This factual distinction is important for two reasons. First, while it may be that Mr. Wilson had a subjective expectation of privacy in the locked room on his employer's premises in which he slept (something this court need not decide), *Stoner* is too factually dissimilar to clearly establish that Mr. Wilson had a right to privacy as an overnight guest on the otherwise commercial premises of his employer. Accordingly, *Stoner* cannot clearly establish the law on the issue of whether society is prepared to recognize Mr. Wilson's subjective expectation of privacy in the locked room of the commercial warehouse.

Second, Mr. Wilson presents no evidence that Corporal Phares had any inkling that the Bay Limousine facility housed a separate room with a fold-out bed and shower, that the employer permitted one of its employees to stay overnight in that room, or that there was or might be an employee sleeping in that room. Quite to the contrary, Mr. Floyd specifically told Corporal Phares that, to his knowledge, no employees or authorized individuals would have been in the Bay Limousine facility at midnight. Additionally, Mr. Wilson has not submitted any evidence that there were any physical attributes – such as signage – indicating that this locked room in the office area of the commercial establishment contained sleeping accommodations for its employees. Because Corporal Phares had no information establishing that there was a structure within the building that was being used for overnight lodging, even assuming *arguendo* that the room's occupant held a Fourth Amendment status similar to that of a guest in a hotel room, a reasonable officer would not have been on notice that Mr. Wilson had a protectable interest in the locked room equivalent to a home. Any mistake that Corporal Phares made about the use of the locked room was a mistake of fact, and officers are entitled to qualified immunity if a mistake of fact was objectively reasonable. *See Anderson v. Creighton*, 483 U.S. 635, 643–44 (1987).

Moreover, based upon the facts known to Corporal Phares, a reasonable police officer could have concluded that anyone on the other side of that locked

29

room was a trespasser who had no privacy interest under the Fourth Amendment. Specifically, Corporal Phares and his canine partner, Kazan, entered the Bay Limousine facility during the midnight hour at the request of another Bay Limousine employee, who had reported a suspicious vehicle at the rear of the business establishment located in a high-crime area.  Corporal Phares entered that facility through its unlocked exterior entrance, after receiving no response to his loud warnings and having received information that no one "was supposed to be in the building."  (Floyd's Aff., at 2.)  When Corporal Phares's canine partner detected humor odor on the other side of the locked door, all the facts known to Corporal Phares indicated that the human attached to that odor was an unauthorized intruder.  Mr. Wilson cites no binding case law that, on these facts, it would have been clear to a reasonable officer that a forced warrantless entry into the locked room violated the Fourth Amendment.  *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("[A] warrantless entry by criminal law enforcement officials may be legal where there is compelling need for official action and no time to secure a warrant.").  Accordingly, Corporal Phares is entitled to summary judgment on the basis of qualified immunity.

Mr. Wilson also cites no case from the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court published prior to April 2012 that provides the requisite concrete factual clarity to establish that Corporal Phares violated the

Fourth Amendment's warrant requirement by entering the locked room based upon Mr. Floyd's consent to search his employer's premises.  The only authority Mr. Wilson musters is *United States v. Hand*, 497 F.2d 929 (5th Cir. 1974).[7]  He does not cite it, however, for its holding, but only for a footnote summarizing the holding in *United States v. Blok*, 188 F.2d 1019 (D.C. Cir. 1951), that "an employer's consent was . . . ineffective to validate search for evidence of an extraneous crime of a desk reserved for an employee's exclusive use," *Hand*, 497 F.2d at 932 n.4.  But *Blok*, a decision from the D.C. Circuit, is not binding authority and cannot clearly establish the law in the Eleventh Circuit.

Moreover, Mr. Wilson cites no binding authority discussing under what circumstances an employee has actual or apparent authority to provide a government official consent to search his employer's business so as to clearly establish the law that Mr. Floyd's consent was invalid.  The court's independent research also reveals a dearth of controlling authority.  While that dearth is dispositive for purposes of the qualified immunity inquiry, it is worth noting that there appears to be a general uncertainty among the circuits as to under what circumstances an employee's consent is valid for a search of his or her employer's premises.  *See generally* 3 Wayne R. LaFave, *Search & Seizure: A Treatise on the*

---

[7] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*Fourth Amendment*, Consent Searches, § 8.6(c) (5th ed. 2012) ("It was observed some years ago that the appellate decisions reflect some confusion and contrariety of opinion on the question of an employee's authority to consent to a search of his employer's business or industrial premises," and "[c]onsiderable confusion still exists, in part perhaps because at least some courts appear uncertain as to what test to utilize in determining the effectiveness of an employee's consent." (collecting cases)).   Because Mr. Wilson points to no binding case law that predates the alleged constitutional violation and presents "a concrete factual context so as to make it obvious to a reasonable government actor that his actions violated" the Fourth Amendment, *Fils*, 647 F.3d at 129, he has not demonstrated clearly established law on the basis of case law.

There also is a second – but exceptional – method for clearly establishing the law.  This method "looks not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" *Fils*, 647 F.3d at 1291.  This method takes "take two forms." *Gilmore v. Hodges*, 738 F.3d 266, 279 (11th Cir. 2013).  "First, a broad statement of legal principle announced in case law may be sufficient if it establishes the law with obvious clarity to the point that every objectively reasonable government official facing the circumstances

would know that the official's conduct did violate federal law when the official acted." *Id.* (citation and internal quotation marks omitted).  Second, "obvious clarity is recognized if the conduct is so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* (citation and internal quotation marks omitted).  The Eleventh Circuit "has made clear that 'obvious clarity' cases will be rare." *Coffin*, 642 F.3d at 1015.  Moreover, "'[o]bvious clarity' cases, rare in general, will be even more rare in the Fourth Amendment expectation of privacy context because it is inherently fact-specific, thus not lending itself to clearly established law." *Id.*

Mr. Wilson falls short under this method as well.  It has long been clear that "a Fourth Amendment search occurs 'when the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *Gennusa*, 748 F.3d at 1110 (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).  It also has long been clear that, with respect to the consent exception to the Fourth Amendment's warrant requirement, only an individual who "possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected" may consent to the search of another's property.  *Matlock*, 415 U.S. at 171.  But these general Fourth Amendment principles do not set out with obvious clarity that Corporal Phares's midnight warrantless entry into a commercial premises' locked room after his canine partner alerted to human scent violates the Fourth

Amendment, where an employee had consented to the search of his employer's premises for intruders and where Corporal Phares had no knowledge that an authorized employee was sleeping in that locked room. Additionally, Mr. Wilson has not shown that the warrantless entry went well beyond anything that a reasonable officer would have considered reasonable.

Accordingly, Corporal Phares is entitled to qualified immunity on Mr. Wilson's § 1983 claim alleging that the warrantless entry into his sleeping quarters at his employer's place of business – in and of itself and apart from the police canine bite – violated his Fourth Amendment right to be free of an unreasonable search.

**B.**    **The § 1983 Claims Against the City of Dothan (Counts IV, VI, VII)**

Mr. Wilson also brings § 1983 claims alleging that the City of Dothan maintained a custom or policy of permitting its officers to use inadequately trained police canines to clear buildings and seize individuals in violation of the Fourth and Fourteenth Amendments (Counts IV, VI). He further brings a § 1983 claim predicated on the City's alleged failure to train its officers in the proper use of a police canine to clear buildings and effectuate lawful seizures of individuals in violation of the Fourth and Fourteenth Amendments (Count VII). Mr. Wilson contends that the City's unconstitutional customs or policies and lack of training

caused the violations of his constitutional rights.[8]   Counts IV, VI, and VII focus on the underlying constitutional violations that Mr. Wilson raises in Counts I and II of the Amended Complaint.

A municipality may be held liable under § 1983 where its failure to train, or its policies or customs, caused a violation of the plaintiff's constitutional rights. *See generally Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123 (1992) ("[I]f a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation."); *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) ("A city may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom."). However, as found in Part IV.A., Mr. Wilson has failed to raise a genuine dispute of material fact that Corporal Phares violated his constitutional rights.  The City's alleged unconstitutional customs, policies, and training with respect to the City's use of police canines, therefore, cannot be said to have caused the alleged violations of Mr. Wilson's constitutional rights, as alleged in Counts I and II of the Amended Complaint.   Absent a constitutional violation, "[a]nalysis of a state

---

[8] Mr. Wilson concedes that his § 1983 Fourteenth Amendment municipality claims, like his § 1983 Fourteenth Amendment claim against Corporal Phares, are "most appropriately analyzed under the unlawful seizure provision of the Fourth Amendment."  (Pl.'s Summ. J. Resp., at 14 (Doc. # 37).)  He also "has no argument in opposition" to Defendants' summary judgment submission with respect to his § 1983 municipality failure-to-train claim.  (Pl.'s Summ. J. Resp., at 14.)

entity's custom or policy is unnecessary." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1170 (11th Cir. 2009); *see also Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."); *Manseau v. City of Miramar*, 395 F. App'x 692, 646 (11th Cir. 2010) ("Plaintiffs stated no denial of a constitutional right. The absence of a constitutional violation by the individual Defendants makes it unnecessary for us to consider whether the City was subject to municipal liability for failure to train its employees or because of a custom or policy.").

Additionally, the City is entitled to summary judgment on the § 1983 claims because, in response to the City's properly supported motion, Mr. Wilson has not introduced any evidence from which it can be inferred that the City acted with deliberate indifference to its citizens or that the City had an express policy or widespread practice that caused constitutional deprivations. *See Lewis*, 561 F.3d at 1293 ("Municipal policy or custom may include a failure to provide adequate training if the deficiency evidences a deliberate indifference to the rights of its inhabitants" (citation and internal quotation marks omitted); *see also Cuesta v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 285 F.3d 962, 966 (11th Cir. 2002) ("A plaintiff can establish § 1983 liability by identifying that she has been deprived of constitutional rights by either an express policy or a widespread practice that,

36

although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom and usage with the force of law." (citation and internal quotation marks omitted)).  For this reason as well, the City is entitled to summary judgment on Counts IV, VI and VII.

## C.   Supplemental State-Law Claims (Counts VIII, IX)

Mr. Wilson's remaining two counts embody state-law claims against Corporal Phares for false arrest, negligence, and wantonness.  A district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all claims over which it has original jurisdiction.  *See* 28 U.S.C. § 1367(c)(3).  While the decision to exercise supplemental jurisdiction is discretionary, the Eleventh Circuit "ha[s] encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial."  *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004).

Exercising its discretion, the court declines to retain supplemental jurisdiction over the state-law claims.  These claims will be dismissed without prejudice should Mr. Wilson wish to refile them in state court.  *See* § 1367(d) (tolling "the period of limitations" on state-law claims while the claim is pending in federal court and "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period").

## V.  CONCLUSION

In accordance with the foregoing analysis, it is ORDERED as follows:

(1)    Defendants' motion for summary judgment (Doc. # 30) is GRANTED as to the federal-law claims (Counts I–IV, VI–VII)[9];

(2)    Plaintiff's motion for summary judgment (Doc. # 32) is DENIED as to the federal-law claims (Counts I–IV, VI–VII);

(3)    Defendants' motion for summary judgment (Doc. # 30) is DENIED as moot as to the supplemental state-law claims (Counts VIII–IX);

(4)    Plaintiff's motion for summary judgment (Doc. # 32) is DENIED as moot as to the supplemental state-law claims (Counts VIII–IX); and

(5)    jurisdiction over the supplemental state-law claims is DECLINED pursuant to 28 U.S.C. § 1367(c)(3).

An appropriate judgment will be entered.

DONE this 31st day of March, 2015.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE

---

[9] The Amended Complaint does not contain a Count V.

38